[Cite as *State v. Jordan*, 2016-Ohio-603.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 26163 |
| | : | |
| v. | : | Trial Court Case No. 12-CR-2285 |
| | : | |
| McKENNA JORDAN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of February, 2016.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
      Attorneys for Plaintiff-Appellee

CANDACE C. CROUSE, Atty. Reg. No. 0072405, and ERIC G. ECKES, Atty. Reg. No. 0072405, 455 Delta Avenue, Suite 105, Cincinnati, Ohio 45226
      Attorneys for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} McKenna Jordan appeals from his convictions for sexual battery and rape.

Finding no error, we affirm.

## I. Background

{¶ 2} Jordan was indicted on August 13, 2012, on five counts of sexual battery, under R.C. 2907.03(A)(5). Later, on March 25, 2013, a sixth count was added—rape, under R.C. 2907.02(A)(2). A jury trial was held at which the victim, "Alice"[1]; her eight-year-old brother, "Ian"[2]; several experts; and Jordan himself testified. This is their pertinent testimony.

{¶ 3} Alice grew up believing that Jordan was her father. She was only three years old when Jordan began dating her mother, and she could not remember a time when he was not a part of her life. Alice testified that in December 2011, shortly after she turned 13 years old, Jordan began sexually abusing her on a regular basis. Usually, Alice would be in her bed at night and Jordan would come into her room, lay down next to her, and begin kissing her neck. He would kiss down her body, from her neck, to her chest, and then to her vagina. Jordan would remove his own clothes and insert his penis into her vagina. When he was done, Jordan would leave without saying anything.

{¶ 4} Alice testified that one day she was in her mother's bedroom sitting on the bed watching television when Jordan came into the room and sat beside her. Jordan soon began fondling her. He then tied Alice's hands to the bed using some straps. He pulled down his and Alice's pants and put his penis into her vagina. At some point, Ian, her younger brother, walked into the room. He testified that he saw that Jordan had "his private parts out" and that Alice was laying down with her hands tied to the bed. (Trial Tr.

---

[1] We will use this pseudonym to refer to the minor victim.

[2] We will use this pseudonym to refer to the victim's minor brother.

895). Ian said that Jordan "told him to get out because he didn't want to go to jail." (*Id.* at 897). Ian said that he left because he "was afraid he [Jordan] was going to hurt me." (*Id.*). After Ian left, Jordan shut and locked the door. He then unstrapped Alice's arms, took her legs, and swung them over the side of the bed. Jordan then got behind Alice and engaged in anal sex.

{¶ 5} The last time that Jordan abused Alice was in July 2012. While watching a movie with Jordan and Ian, Alice became tired and went to bed. Shortly after, Jordan came into her room and began kissing her neck, then kissing and licking her breasts on top of and underneath her bra, then kissing and licking her vagina on top of and underneath her underwear, before inserting his penis into her vagina. After Jordan had finished, and she had cleaned herself off in the bathroom, Alice took the phone to her bedroom and called her grandmother for help. Alice snuck out of the house and into her grandmother's waiting car. They went back to the grandmother's house and called the police. The police told Alice to go to Dayton Children's Hospital, which she did, where a standard rape-kit examination was performed and the clothing that she was wearing— shorts, underwear, and bra—was collected.

{¶ 6} The Miami Valley Regional Crime Laboratory did the first analysis of the items that were collected. It found nothing. Over 400 days later, in October 2013, the Ohio Bureau of Criminal Investigation (BCI) analyzed the clothing using an advanced method designed to detect the presence of amylase, a protein found in most bodily fluids. David Ross, a forensic scientist at the BCI and an expert in the field of serology[3], found amylase

---

[3] Ross said that serology is "the examination of items of evidence for the presence of body fluids that may contain a DNA profile, body fluids such as blood, semen, saliva." (Trial Tr. 540).

on Alice's shorts and underwear and a particularly high concentration of amylase on her bra. Ross testified that after amylase is deposited it begins to degrade until it is no longer detectable. Saliva, said Ross, is the bodily fluid with the highest concentration of amylase, and amylase from saliva is able to be detected on an item for a much longer period of time. Ross cited a 1986 study that found that amylase from saliva was still detectable after 149 days. According to Ross, the study concludes that "after one week, any form of amylase activity that is detectable is likely from saliva." (Trial Tr. 574). Therefore Ross concluded that the substance on Alice's bra was saliva. Erika Jimenez, a forensic DNA scientist at the BCI, tested the clothing for DNA. On the outside of Alice's shorts, on the outside and inside of her underwear, and on the inside of her bra, Jimenez found a partial DNA profile that is consistent with Jordan's DNA. Jimenez testified that Jordan was the major contributor of the DNA found on the inside of both bra cups. She said that the chances of the DNA belonging to anyone other than Jordan are 1 in 562,700,000,000,000,000,000.

{¶ 7} Jordan presented the testimony of Daniel Krane, a DNA expert. Krane did not challenge Jimenez's DNA analysis or her conclusion that Jordan was the major contributor of the DNA found in the bra cups. But Krane did challenge Ross's opinion that the substance on Alice's bra is saliva. According to Krane, there should have been very little, if any, amylase activity after 455 days. If the test results were as strong as Ross characterized them, said Krane, the substance was more likely deposited on the evidence recently. Jordan's theory is that the bra was contaminated a few months before the BCI testing when Jordan and his attorney inspected the clothing items at the police station.

{¶ 8} The jury found Jordan guilty of three counts of sexual battery and of rape.

The trial court sentenced him to a total of seven years in prison.

{¶ 9} Jordan appealed.

## II. Analysis

{¶ 10} Jordan assigns five errors to the trial court. The first assignment of error challenges the admission of "other acts" evidence under Evid.R. 404(B). The second challenges the instruction given to the jury on the rape-offense element of force. The third challenges the competence of Ian, Alice's younger brother, to testify. The fourth alleges that trial counsel rendered ineffective assistance. And the fifth assignment of error alleges that cumulative error prejudiced Jordan.

## A. The Evid.R. 404(B) evidence

{¶ 11} The first assignment of error alleges that the trial court erred by admitting evidence of Jordan's prior acts of violence against the victim's mother and brother.

{¶ 12} "The trial court has broad discretion in the admission and exclusion of evidence, including evidence of other acts under Evid.R. 404(B). Unless the trial court has 'clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere' with the exercise of such discretion." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 67, quoting *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶ 13} "Evid.R. 404(B) * * * precludes the admission of evidence of other crimes, wrongs, or acts offered to prove the character of an accused in order to show that the accused acted in conformity therewith, but it does not preclude admission of that evidence for other purposes." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d

1278. *Accord* R.C. 2945.59. "Generally, evidence of other acts is admissible if it is offered for a purpose other than to prove the character of a person in order to show action in conformity with that character, Evid.R. 404(B), it is relevant when offered for that purpose, Evid.R. 401, and the danger of unfair prejudice does not substantially outweigh its probative value, Evid.R. 403." *Kirkland* at ¶ 68, citing *Williams* at ¶ 20.

{¶ 14} One of the elements of rape is that the defendant compelled the victim "to submit by force or threat of force." R.C. 2907.02(A)(2). Finding the evidence relevant to the force element, the trial court allowed Alice, Ian, and their social worker to testify about Jordan's violent acts.

{¶ 15} Alice testified that Jordan physically abused her mother and brother. She testified that she saw Jordan head butt her mother in the face, breaking her nose; push her mother into a wall; and kick Ian in the stomach. Ian testified that he saw Jordan punch his mother in the nose, causing it to bleed. Ian then said, however, that he did not see Jordan punch her but saw blood on the ground while looking under the door. Ian also said that Jordan kicked him in the stomach. Francis Duncan, Alice and Ian's social worker, testified that Alice told her about "physical abuse and domestic violence" in the home. (Trial Tr. at 382). Duncan said that Alice told her that "[Jordan] was violent and * * * abusive, physically abusive to her mother and her brother." (*Id.* at 427). Duncan also said that Alice saw Jordan kick her brother in the side and that "Jordan had broken her mother's nose, spit in her mother's face, hit her, a lot of aggression and violence." (*Id.*).

{¶ 16} Jordan contends that none of this testimony is relevant to prove force. He points out that the bill of particulars alleges that the force he used was tying Alice to the bed. His actions against Alice's mother and brother, Jordan says, have nothing to do with

whether he tied up Alice. Jordan also contends that even if the evidence was admissible under Evid.R. 404(B), it should have been excluded as unfairly prejudicial under Evid.R. 403(A).

**{¶ 17}** "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A). When the victim is a child over whom the defendant is in a position of authority, the Ohio Supreme Court held in *State v. Eskridge*, the " '[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.' " (Citations omitted.) *State v. Eskridge*, 38 Ohio St.3d 56, 58-59, 526 N.E.2d 304 (1988), quoting *State v. Fowler*, 27 Ohio App.3d 149, 154, 500 N.E.2d 390 (8th Dist.1985).

**{¶ 18}** Jordan argues that the *Eskridge* psychological-force standard does not apply in this case, because Alice was not a small child when the rape occurred, like the four-year-old victim in *Eskridge*. He relies on this Court's statement that "[i]f the rule of law espoused in *Eskridge* applies at all in this case, it would not apply as it might if the child victim was much younger. The necessary element of force * * * is not satisfied by the mere fact that the offender is the victim's parent or by some subjective belief or feeling on the part of the victim that submission is required. Some showing by the State that the offender, through his own acts, compelled the victim to submit to sexual contact by 'force or threat of force,' however slight, is required." *State v. Hiles*, 2d Dist. Montgomery No. 13803, 1994 WL 43102, *3 (Feb. 11, 1994).

**{¶ 19}** But we do not say in the above-quoted statement that the *Eskridge* standard does not apply at all in cases where the victim is an older child. What we say is that

evidence of psychological force is not enough by itself. There also must be at least some evidence of physical force. In other words, in cases of teenage child victims, psychological evidence is still relevant to establish the force element; it's just not enough for a conviction, as it would be if the child were younger. Indeed, we have cited the *Eskridge* standard in prior cases of teenage victims. *See, e.g., State v. Zimpfer*, 2d Dist. Montgomery No. 26062, 2014-Ohio-4401 (sixteen-year-old victim). Other Ohio appellate courts too have applied the *Eskridge* standard in cases of teenage victims. *See, e.g., State v. Musgrave*, 9th Dist. Summit No. 18260, 1998 WL 831574 (Dec. 3, 1998) (thirteen-year-old victim); *State v. Milam*, 8th Dist. Cuyahoga No. 86268, 2006-Ohio-4742 (thirteen-year-old victim); *State v. Haschenburger*, 7th Dist. Mahoning No. 05 MA 192, 2007-Ohio-1562 (fourteen- to sixteen-year-old victim); *State v. Dippel*, 10th Dist. Franklin No. 03AP-448, 2004-Ohio-4649 (fourteen-year-old victim); *State v. Oddi*, 5th Dist. Delaware No. 02CAA01005, 2002-Ohio-5926 (fifteen-year-old victim).

**{¶ 20}** Here, Alice testified that Jordan's violent acts against her mother and brother made her afraid of what Jordan might do to her. It was also her fear that kept her quiet for so long. She testified that the prior acts of domestic violence made her "very afraid of McKenna." (Trial Tr. 738). She said that she did not tell anyone sooner because of her fear: "I knew what McKenna was capable of doing, his aggression. I was very scared of what might happen if I was to come out and tell anybody." (*Id.* at 739). On cross-examination, Alice testified that Jordan never threatened her. But "that was what was so scary * * * because I didn't know what could happen and I knew how he is." (*Id.* at 813-814). "[B]y him not saying anything," she continued, "it's more terrifying, like, I knew what McKenna was capable of doing. I've seen it with my own eyes. I've gone through my own

abuse and I didn't know what would happen to my family. It's just 10 times more scarier not knowing." (*Id.* at 814).

{¶ 21} We think that the trial court reasonably found the other-acts evidence is relevant to the element of force.

{¶ 22} We are not convinced that the bill of particulars provides sufficient grounds to reverse. "A bill of particulars has a limited purpose—to elucidate or particularize the conduct of the accused alleged to constitute the charged offense." *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985). The bill of particulars here states that as to the rape charge "the State intends to prove that * * * Defendant did engage in sexual conduct with another, to wit: [Alice], by purposefully compelling the victim to submit by force or threat of force, to wit: tying her to the bed." *State's Response to Defendant's Motion for Bill of Particulars* (April 16, 2013).

{¶ 23} Crim.R. 33, however, provides that a conviction cannot be reversed because of "[a] variance between the allegations and the proof thereof, unless the defendant is misled or prejudiced thereby." Crim.R. 33(E)(2). The trial court here concluded that Jordan was not misled or prejudiced. The court pointed out that roughly two months before trial the state filed written notice of its intent to use the Evid.R. 404(B) evidence. We agree with the trial court's conclusion.

{¶ 24} Lastly, any danger of unfair prejudice was ameliorated by a limiting instruction. Evid.R. 403(A) states that relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Any danger of unfair prejudice is reduced by giving the jury a limiting instruction. *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15

N.E.3d 818, ¶ 70.

{¶ 25} Here, in its final instructions to the jury, the trial court gave this limiting instruction: "Testimony regarding alleged acts of violence by the defendant towards family members may only be considered with regard to the element of force or threat of force in the rape count and may not be considered for any other purpose." (Trial Tr. 1467). It may have been better if the court had given the instruction immediately following the Evid.R. 404(B) testimony and also reiterated it in the charge to the jury. But the trial court could reasonably have found that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence.

{¶ 26} On this record we cannot say that the trial court abused its discretion by admitting the evidence of Jordan's other acts.

{¶ 27} The first assignment of error is overruled.

### B. The jury instruction on force

{¶ 28} The second assignment of error alleges that the trial court's instruction on the element of force is improper.

{¶ 29} "The decision whether to give a particular jury instruction is a matter left to the sound discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of discretion." *State v. McGhee*, 2d Dist. Montgomery No. 23226, 2010-Ohio-977, ¶ 66.

{¶ 30} The trial court's force-element instruction here began by following the statutory language:

In this case, it must be established at the time in question there was

present in the mind of McKenna Jordan a specific intention to compel the alleged victim to submit to sexual conduct by force or threat of force.

Force means any violence, compulsion or constraint physically exerted by any means upon or against a person. Threat includes a direct or indirect threat. The alleged victim need not prove physical resistance to the defendant; however, there must be submission to sexual conduct by force or threat of force.

(Trial Tr. 1473). Over Jordan's objection, the trial court added this additional instruction:

When the relationship between the alleged victim and the defendant is one of child and stepparent, the element of force need not be openly displayed or physically brutal. It can be subtle, slight and psychologically and emotionally powerful. If you find beyond a reasonable doubt that under the circumstances in evidence the victim's will was overcome by fear, duress or intimidation, the element of force has been proved.

(*Id.* at 1473).

{¶ 31} Jordan's argument here is similar to his argument supporting the first assignment of error. For the reasons that we rejected his argument there, we reject his argument here. An *Eskridge* instruction is appropriate in this case.

{¶ 32} The second assignment of error is overruled.

### C. The competence of Ian to testify as a witness

{¶ 33} The third assignment of error alleges that the trial court erred by finding eight-year-old Ian competent to testify.

{¶ 34} "It is the duty of the trial judge to conduct a voir dire examination of a child under ten years of age to determine the child's competency to testify." *State v. Frazier*, 61 Ohio St.3d 247, 250-251, 574 N.E.2d 483 (1991). "In determining whether a child under ten is competent to testify, the trial court must take into consideration (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful." *Id.* at syllabus. "[T]he determination of competency is within the sound discretion of the trial judge. The *Frazier* factors form the backdrop against which a reviewing court evaluates whether the trial judge's determination was an abuse of discretion." (Citations omitted.) *Schulte v. Schulte*, 71 Ohio St.3d 41, 43, 641 N.E.2d 719 (1994).

{¶ 35} The trial court here personally examined Ian at a competency hearing. The court also considered three exhibits—a transcript of an interview that Ian gave to police in December 2012, a report from a defense expert psychologist critiquing the police interview, and Ian's psychological and therapy records.

{¶ 36} The trial court found Ian competent to testify as a witness because Ian "has the intellectual capacity to have observed, to have received just impressions of and to recollect and recount the facts and transactions respecting which he will be examined at this upcoming trial" and because he "has the ability to accurately recall things from the entire period of the indicted charges, that he is capable of telling and understanding his obligation to tell the truth." (Jan. 17, 2014 Pre-trial Hearing Tr. 9). The court acknowledged

that the police interview and the psychologist's report raise "serious concerns about the child's reliability as an informant and competency as a witness." (*Id.* at 6). But the police interview having been conducted over a year before, the court placed the greatest weight on its own examination of Ian because it was the closest to the trial. The court found that Ian knew the difference between the truth and a lie: "[H]e was completely and always correct in demonstrating to the Court he knows the difference between what is the truth and what is a lie and there was no confusion at all demonstrated in that regard." (*Id.* at 7). The court also found that Ian could recall the events covered by the period in the indictment:

> He demonstrated an ability to accurately recall events going back in time including recollection of the house that he lived in before July 2012 when, at the end of this period of this indictment July 30, 2012, that is I meant to say 2012, he moves to another residence.
>
> And the Court, therefore, explored his recollection as to where he lived prior to 2012 since that falls within the period of the indicted charges. And he demonstrated an ability to recall as far back to the time that he was in kindergarten, that would have been starting in the fall of 2010.

(*Id.* at 7-8). The court further found that Ian knew he had an obligation to tell the truth: "And he demonstrated an appreciation, convincingly, to this Court of his obligation to tell the truth, that telling the truth, he convincingly demonstrated to the Court is a good thing and telling a lie is a bad thing for which he said he would be punished by his teacher, by his mother." (*Id.* at 8). The court found that he understood what an oath is: "He demonstrated to the Court that he understands the nature of what an oath is and that that

it essentially equates to a promise and that he said his promise would be to tell the truth when he testified in this upcoming trial." (*Id.*). Lastly, the court found that Ian had a credible demeanor: "[T]he Court observed the demeanor of [Ian] and the Court was impressed with his demeanor and he had a demeanor of credibility and the Court's direct personal interaction with him." (*Id.*).

**{¶ 37}** Jordan argues that the competency hearing was inadequate because Ian did not exhibit an ability to recall events accurately from the time period when Alice alleged she was abused. Jordan points out that this is shown by Ian's trial testimony. Moreover, Jordan argues, when considering the serious competency issues that Ian exhibited in the police interview, he should have been questioned more extensively about the difference between a truth and a lie. At most, he continues, the trial court's questioning shows only that Ian had an insufficient cursory understanding of the truth versus a lie. Further, Jordan argues, the trial court did not ask questions that would determine whether Ian could provide consistent, accurate, impressions of what happened in the past. He was not asked to describe any actual events that occurred in his life during the relevant time period. Instead, the trial court relied on the fact that he remembered living in a different house. When describing kindergarten, Ian does not know if he went a half-day or a full day. And when describing his kindergarten friends, he clearly does not understand the trial court's simple questions, and his nonsensical answers show serious confusion about his recollections of the past.

**{¶ 38}** Jordan says that Ian never consistently or reliably described any event from the relevant time period. The only past event he describes with any detail, says Jordan, is seeing Alice tied to the bed. But when telling this story, he could not state consistently

basic facts like who was in room, whether they had clothes on, or whether Ian was kicked in the stomach. These contradictions in basic facts show he could not receive accurate impressions of fact from the alleged event, recollect his impressions reliably, or communicate what he observed.

{¶ 39} At the time the trial court determined that Ian was competent to testify, he had not given any trial testimony. So his later trial testimony is irrelevant to whether the court abused its discretion by finding him competent.

{¶ 40} As to the competency evaluation, "it is not the role of the trial judge to determine that everything a child will testify to is accurate, but whether the child has the intellectual capacity to accurately and truthfully recount events." (Citation omitted.) *State v. Jones*, 12th Dist. Brown No. CA2000-11-032, 2001 WL 1402638, *6 (Nov. 13, 2001). "The fact that a child cannot remember certain generalities does not deem the child incompetent to testify. The key issue is whether the minor was able to receive accurate impressions of fact and could truthfully relate those impressions in court." *State v. Brooks*, 2d Dist. Montgomery No. 18502, 2001 WL 1295285, *3 (Oct. 26, 2001). The failure to remember generalities concerns not competency but credibility. *Id.* We note too that "a competence hearing need not involve questioning a child about the specific sexual abuse allegations at issue in a case." *State v. Molen*, 2d Dist. Montgomery No. 21941, 2008-Ohio-6237, ¶ 12. *Accord Brooks* at *3 (" 'Once the court determines that a person can properly recount events from the past and knows that she should tell the truth in court, she is competent.' Although it would have been helpful if the trial judge would have questioned the minor regarding the rape and the circumstances surrounding the rape, it was not necessary in the trial court's competency determination."), quoting *State v.*

*Mayhew*, 71 Ohio App.3d 622, 629, 594 N.E.2d 1133 (4th Dist.1991).

{¶ 41} Here, the record supports the trial court's findings regarding Ian's competency to testify. We cannot say that the trial court's competency determination is an abuse of discretion.

{¶ 42} The third assignment of error is overruled.

### D. Ineffective Assistance of Counsel

{¶ 43} The fourth assignment of error alleges that defense counsel was ineffective for not challenging an opinion given by David Ross, not calling a witness, and not challenging the admission of the BCI's DNA test results.

{¶ 44} The standard applied to counsel's performance is well known:

A reviewing court may not reverse a conviction for ineffective assistance of counsel unless the defendant shows first that counsel's performance prejudiced the defense so as to deprive the defendant of a fair trial. *See Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. "When a convicted defendant complains of ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674. There is a strong presumption that an attorney's representation fell within the "wide range of reasonable professional assistance," because there are many ways to provide effective counsel. *Id.* at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674; *see State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373.

*State v. Crooks*, 152 Ohio App.3d 294, 2003-Ohio-1546, 787 N.E.2d 678, ¶ 16 (1st Dist.).

### 1. *Ross's expert opinion*

{¶ 45} David Ross, the BCI serologist, testified that based in part on the finding of a 1986 study, it was his opinion that the substance on Alice's bra was saliva, even though 455 days had passed since it was deposited. Saying that Ross's opinion is unreliable guesswork, Jordan contends that Ross's extrapolation of the finding in the 1986 study is based on unscientific principles and methods and is not supported by the paper itself.

{¶ 46} "[E]xpert witnesses in criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 77. "The treatment of such testimony involves 'an issue of sufficiency, not admissibility.' " *Id.*, quoting *State v. D'Ambrosio*, 67 Ohio St.3d 185, 191, 616 N.E.2d 909 (1993). " ' "Questions about the certainty of the scientific results are matters of weight for the jury." ' " *Id.*, quoting *State v. Allen*, 5th Dist. No. 2009-CA-13, 2010-Ohio-4644, ¶ 157, quoting *United States v. Brady*, 595 F.2d 359, 363 (6th Cir.1979).

{¶ 47} Jordan does not challenge any of Ross's opinions about the nature of amylase in saliva, nor does Jordan challenge the conclusions of the 1986 study. What Jordan challenges is Ross's opinion that, because amylase in saliva is detectable for the longest period of time, the substance on Alice's bra must be saliva. Thus Jordan is not challenging the reliability of the basis for Ross's opinion but is merely challenging the reliability of the opinion itself, which is a jury question. Also, defense counsel did challenge the opinion on cross-examination and presented the testimony of an expert who disagreed with Ross's opinion.

## 2. *The failure to call a witness*

**{¶ 48}** Jordan next contends that defense counsel was ineffective because counsel did not call a witness that, Jordan says, was critical to his defense.

**{¶ 49}** In opening statements, says Jordan, counsel promised the jury that this witness would testify:

> You'll also hear—and this is just common sense—you'll also hear that if, indeed, it happened the way [Alice] claims it happened, 50 or 60 times, with, during that time, some full insertion of the penis into the vaginal area with humping, and not just for a couple seconds but for a long time, and the same with the anal, that upon examination you would expect to see something. You would expect to see some trauma in the anal area or to the vaginal area. And that's just common sense, if it happened at all. You would expect to see something and nothing was found.

(Trial Tr. 265). Counsel is here referring, says Jordan, to Stephen Guertin, an expert whose name is on the defense's witness list and whose written report contains the substance of what his testimony would have been. This report is not in the record. Jordan recognizes that because his claim relies on evidence outside the record it would be better to bring it in a petition for post-conviction relief. We agree. On the record before us, there is no basis for the claim that defense counsel failed to call this witness.

**{¶ 50}** Based on the record, it appears that defense counsel did present the testimony he promised. Phillip Esplin testified for the defense as an expert in forensic

psychology and child abuse. He gave detailed testimony on why it is that if the sexual abuse occurred in the manner alleged, there is a good chance that trauma of the sort described in counsel's opening statements would be seen.

### 3. *The DNA test results*

{¶ 51} Finally, Jordan contends that defense counsel was ineffective for not challenging the admission of the BCI's DNA test results. He says that counsel should have objected to admission on the basis of contamination.

{¶ 52} "The possibility of contamination goes to the weight of the evidence, not its admissibility." *State v. Richey*, 64 Ohio St.3d 353, 360, 595 N.E.2d 915 (1992), overruled on other grounds, *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997). In *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, the state introduced a flashlight that an officer had used to strike the defendant in the head during their struggle. The state also introduced test results showing that DNA found on the flashlight was consistent with the defendant's DNA. The defendant argued that the admission of the flashlight and DNA test results was error because the officer who retrieved the flashlight did not use fresh latex gloves and earlier testing had found no genetic material on the flashlight. The defendant contended that the state failed to establish a chain of custody sufficient to satisfy Evid.R. 901(A)'s authentication requirement as a condition precedent to admissibility. The Ohio Supreme Court rejected this argument, saying that "[a]s a general matter, 'the state [is] not required to prove a perfect, unbroken chain of custody,' " *Gross* at ¶ 57, quoting *State v. Keene*, 81 Ohio St.3d 646, 662, 693 N.E.2d 246 (1998). " 'A strict chain of custody is not always required in order for physical evidence to be admissible.' " *Id.*, quoting *State v. Wilkins*, 64 Ohio St.2d 382, 389, 415 N.E.2d 303 (1980).

"The arguments that an officer failed to change gloves and that a second round of testing found previously undiscovered genetic material on the flashlight go to the weight to be afforded the evidence, not to the admission of the evidence." *Id.*, citing *Richey* at 360.

{¶ 53} Here, contamination was not a basis on which defense counsel could have challenged the admission of the DNA test results. We note that counsel did challenge the test results' reliability by presenting expert testimony that supported the theory of contamination.

{¶ 54} Jordan fails to show that defense counsel acted unreasonably in any of the respects alleged.

{¶ 55} The fourth assignment of error is overruled.

## E. Cumulative error

{¶ 56} The fifth assignment of error alleges that even if we find that none of the individual errors that Jordan assigns, by itself, constitutes reversible error, the cumulative effect of those errors deprived him of a fair trial. *See State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987). Because Jordan has failed to show any error, the cumulative error doctrine does not apply here. *See State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 157 (finding that the doctrine of cumulative error did not apply because the defendant failed to establish multiple instances of error).

{¶ 57} The fifth assignment of error is overruled.

## III. Conclusion

{¶ 58} We have overruled each of the assignments of error presented. Therefore the trial court's judgment is affirmed.

. . . . . . . . . . . . .

FAIN, J., concurs.

FROELICH, J., concurring:

{¶ 59} The issues surrounding a young child's testimony in general, let alone sexual abuse cases, are significant and complex. *See, e.g.,* Raeder, *Navigating between Scylla and Charybdis: Ohio's Efforts to Protect Children Without Eviscerating the Rights of Criminal Defendants-Evidentiary Considerations and the Rebirth of Confrontation Clause Analysis in Child Abuse Cases*, 25 U.Tol.L.Rev. 43 (1994); Shanks, *Evaluating Children's Competency to Testify: Developing a Rational Method to Assess a Young Child's Capacity to Offer Reliable Testimony in Cases Alleging Child Sex Abuse*, 58 Clev. St.L.Rev. 575 (2010).

{¶ 60} In Ohio, while "a witness under the age of ten is not presumed incompetent," *State v. Clark*, 71 Ohio St.3d 466, 469, 644 N.E.2d 331 (1994), it is the duty of the trial court to determine if the child is capable of receiving just impressions of the facts and transactions respecting which he or she is examined and of relating them truly. Evid.R. 601.

{¶ 61} Both at the January 16 competency hearing (Jan. 16, 2014 Hearing at 26) and the conference of January 17, where the court announced its conclusions (Jan. 17, 2014 Hearing at 3), the record reflects that the judge said the child was "presumed competent." I assume these are typos given that there was no objection and that the judge later, at both proceedings, clearly articulated the burden on the State.

{¶ 62} In addition to interviewing the child, the trial court did review a transcript of the detective's interview of the child of one year earlier, a report of a defense expert relating to that interview, and "psychological records" of the child. The judge commented

that one part of the exchange with the detective "should raise serious questions about [the child's] competency to testify in an accurate, reliable manner." (January 17, 2014 Hearing at 4).

{¶ 63} The trial court gave "greatest weight to the Court's own personal examination of this child" (*Id.* at 6) and "observed the demeanor of [the child] . . . and he had a demeanor of credibility and the Court's direct personal interaction with him" (*Id.* at 8); he then found the child "competent to testify as a witness at the trial of this case next week." (*Id.* at 9).

{¶ 64} The ability to understand truth and falsity and to appreciate the responsibility to be truthful, are only relevant if the child can receive and recollect accurate impressions of facts. That is, if the impressions are inaccurate, a child, or an adult for that matter, could understand truth and falsity, appreciate the responsibility to be truthful, and sincerely be "telling the truth," and the testimony would still be unreliable and inadmissible.

{¶ 65} The only questions asked of the child in the interview about the past were his kindergarten teacher's name and one friend's name, and he volunteered that his former house was gray. The record does not reflect whether these were accurate. If the record only consisted of the in camera interview and the exhibits reviewed by the Court, I would have difficulty finding that the court did not err in determining the child competent to testify at the upcoming trial.

{¶ 66} The question, however, is whether the child was competent "when he is examined" in court. In this regard, his trial testimony is extremely relevant, albeit informed by the pre-trial determination. Given the Court's "personal examination" of the

child, the review of the reports and then the live testimony of the psychologists and the detective, and the judge's observations of the actual in-court testimony of the child, I concur that the trial court did not abuse its discretion in finding the child competent and admitting his testimony under oath in open court.

. . . . . . . . . .


Copies mailed to:

Mathias H. Heck
Andrew T. French
Candace C. Crouse
Eric G. Eckes
Hon. Dennis J. Langer