COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. CT2024-0038 |
| | : | |
| RANDY DILLON | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Muskingum County
                             Court of Common Pleas, Case No.
                             CR2007-0114

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      Janaury 29, 2025

APPEARANCES:

For Plaintiff-Appellee:                For Defendant-Appellant:

Joseph A. Palmer                       Randy Dillon, pro se
27 North Fifth Street                  #579-012
Zanesfield, Ohio 43702                 P.O. Box 5500
                                       Chillicothe, Ohio 45601

*Delaney, P.J.*

{¶1} Defendant–Appellant Randy Dillon has appealed the March 4, 2024, Journal Entry of the Muskingum County Court of Common Pleas denying his Application for DNA Testing. He has appeared *pro se*. Plaintiff–Appellee is the State of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2} In 2008, Defendant was found guilty following a jury trial of burglary, kidnapping, attempted murder, and rape of a victim under the age of 10. On February 29, 2024, he filed a post-conviction Application for DNA Testing with the Muskingum County Court of Common Pleas seeking to retest two items of clothing. We affirmed the judgment and sentencing in *State v. Dillon,* 2009-Ohio-3134 (5th Dist.). The following facts are taken from that appeal.

{¶3} Sometime late the night before or in the early morning of March 13, 2007, a 14-month-old child was picked up in her bed and taken out of her home. Her mother had put her in her crib sometime after 11:00 p.m. When she went to check on her at 4:00 a.m., the child was missing. The child was found in a field before noon the next day, where she had been wrapped in a comforter and left lying on the ground. She was found by a man walking in the field. A driver stopped to help and another man who had been driving through the area earlier came back and offered his assistance. After medical crews and law enforcement arrived, the child was taken for medical care.

{¶4} Around the same time the child was being put to bed, Defendant was drinking with a friend and some other people. Sometime after midnight, Defendant borrowed his friend's van to go purchase more cigarettes. He did not return but called about 5:00 a.m. from a gas station and said he needed a ride.

{¶5} The clerk at the station called the police because Defendant was bothering the customers. When the police arrived, they arrested him on an unrelated warrant. After his arrest, appellant met with a patrolman and filed a report indicating that he was attacked, robbed, and abducted during the timeframe when the state contended that the alleged crimes occurred. Through a series of sustained objections, this information was never presented to the jury.

{¶6} When the van was subsequently found in the area where the child was rescued, Defendant became a suspect in her abduction. Tire castings recovered from behind the child's house were consistent with the tires on the van. The comforter wrapped around the child had previously been placed in the back of the van by its owner. There was a sheet in the van that matched the one that had been on the child's bed.

{¶7} An eyewitness described seeing someone walking alongside the road away from the area where the child had been left at around 4:00 a.m. The person he saw had similar characteristics to Defendant. Additionally, surveillance video from two separate gas stations placed Defendant in the same area moving in a direction away from the field.

{¶8} The shoes Defendant was wearing at the time he was arrested had mud on them. The mud was analyzed and found to be consistent with mud samples taken from the location where the van was recovered.

{¶9} The jury heard medical evidence that the child suffered an injury inside of her labia majora that was not consistent with a rash but was consistent with sexual assault. The injury included a small amount of blood.

{¶10} The jury also heard testimony from a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation (BCI). He testified that amylase was found on

her diaper which indicated the presence of saliva, but it did not reveal a conclusive DNA profile. Testing was done on the onesie that child was wearing when she was found. It revealed DNA consistent with Defendant's profile on the underarm of the onesie such that he could not be excluded as a contributor. DNA consistent with the child's profile was found on the hip area of the T-shirt Defendant was wearing at the time of his arrest. She could not be excluded as a contributor. No semen was found on the items that were submitted for forensic analysis. Defendant did not provide an expert to rebut the DNA evidence at trial.

{¶11} The jury found Defendant guilty. He was sentenced to 28 years of incarceration, plus life without parole, to run consecutively.

{¶12} Defendant filed an Application for DNA Testing in the Muskingum County Court of Common Pleas. He is seeking to have the two of the same articles of clothing retested, specifically the onesie that the child was wearing and the T-shirt he was wearing that night. With his application, he attached a laboratory report that was presented at trial regarding the results of the DNA testing. It reflects that DNA profiling was performed using polymerase chain reaction testing on a diaper, a onesie, and a T-shirt.

{¶13} The diaper was tested using cuttings from the crotch as well as swabs from the area. There was insufficient DNA profile data to draw any conclusions regarding the source of the DNA.

{¶14} The DNA profile from swabs used on the underarm area of the onesie was a mixture of at least two individuals. The BCI scientist testified that the major DNA profile was consistent with the child and the partial minor DNA profile was consistent with contributions from the child's mother and the Defendant. The BCI report stated "[b]ased

on the national database provided by the Federal Bureau of Investigation, the proportion of the population that cannot be excluded as possible contributors to the mixture of DNA profiles" was 1 in 4,919 unrelated individuals. Neither the child's mother nor Defendant could be excluded as a contributor to the DNA.

{¶15} The DNA profile from swabs used on the hip of the T-shirt was a mixture of at least three individuals. The major DNA profile was consistent with Defendant. The partial minor DNA profile was consistent with contributions from the child and an unknown individual. The BCI report stated "[b]ased on the national database provided by the Federal Bureau of Investigation, the proportion of the population that cannot be excluded as possible contributors to the mixture of DNA profiles" was 1 in 88 unrelated individuals. The child could not be excluded as a contributor.

{¶16} The trial court summarily denied the Application for DNA testing and Defendant filed his notice of appeal. The court then asked the parties to submit findings of facts and conclusions of law. Defendant's assignment of error to this Court is based on the trial court's subsequent findings of fact and conclusions on law in the second Judgment Entry.

{¶17} In this case, the trial court made the following findings of fact:

Defendant filed an Application for DNA testing on February 29, 2024. Said DNA was previously tested and the results were introduced by the State during the jury trial. The defendant was found guilty by the Jury. Defendant requested DNA to be tested again on the same biological evidence that was presented during the trial back in April 2008, over 16 years ago. DNA expert testimony was presented during the trial. Defendant did not introduce any expert to rebut the State's witness on the DNA testimony.

{¶18} The trial court also made the following conclusions of law:

The prior DNA testing conducted on the evidence collected by law enforcement, clearly established the biological material belonged to the Defendant. The identity of the Defendant, as the perpetrator, was not in doubt, as evidenced by the extensive trial record, and the verdict of the Jury. Therefore, the Application for DNA Testing is Denied.

Defendant has appealed the denial of his application.

## ASSIGNMENT OF ERROR

{¶19} THE TRIAL COURT ABUSED IT'S [SIC] DISCRETION IN FINDING THAT PRIOR DNA TESTING CLEARLY ESTABLISHED THE BIOLOGICAL MATERIAL BELONGED TO THE DEFENDANT AND THAT THE IDENTITY OF THE DEFENDANT, AS THE PERPETRATOR, WAS NOT IN DOUBT, WHEN IT DENIED DEFENDANT'S APPLICATION FOR DNA TESTING.

## ANALYSIS

{¶20} Before we analyze the Defendant's assignment of error, we first address the effect of filing a judgment summarily denying an application for testing and then issuing findings of fact and conclusions of law after the notice of appeal had been filed. The Ohio Supreme Court has held that when a case has been appealed, "the trial court loses jurisdiction except to take action in the aid of the appeal." *In re S.J.,* 2005-Ohio-3215. A similar situation occurred, however, in *State v. Riley,* 2024-Ohio-5712, when the trial court failed to comply with R.C. 2953.73(D) and denied an application without explanation. The trial court then supplemented its order with adopted findings and conclusions.

{¶21} The Ohio Supreme Court raised the question of whether explaining a reason is an act in aid of the appeal and, as such, affected jurisdiction. It stated "although the question whether the trial court may correct its own error after an appeal has been

filed is an interesting one, this court did not accept jurisdiction over that question and we will therefore not address it." This Court will proceed accordingly.

{¶22} Although Defendant has posed a single assignment of error, he has asserted that since his trial there have been advances in DNA testing that would make the results more accurate. He has argued that the trial court erred in denying his application because it concluded that the prior testing clearly established the biological material belonged to him and it concluded that the results identifying him as the perpetrator were not in doubt. Finally, he has argued that the trial court did not properly review the record or case law necessary to consider the issues.

{¶23} Post-conviction DNA testing is governed by R.C. 2953.71 to 2953.81. An eligible offender who wishes to request DNA testing must submit an application to the court of common pleas that sentenced him. R.C. 2953.73.[1]

{¶24} Upon receipt of the application, the trial court examines the application and the criteria of R.C. 2953.74 to determine if the offender is eligible for additional DNA testing. R.C. 2953.74(A) provides if an eligible offender applies for DNA testing "and a prior definitive DNA test has been conducted regarding the same biological evidence that the offender seeks to have tested, the court shall reject the offender's application." R.C. 2953.74(A); *State v. Prade,* 2010-Ohio-1842; *State v. Noling,* 2013-Ohio-1764. The Ohio Supreme Court referred to whether there is a prior definitive test as the "threshold criterion." *Noling* at ¶ 34.

---

[1] R.C. 2953.73(E)(1) was ruled unconstitutional on other grounds by *State v. Noling*, 2016-Ohio-8252. The two invalid provisions were deemed severable from the remainder of the statue and do not apply to this opinion.

{¶25} A trial court has discretion to determination whether to grant a post-conviction request for DNA testing. R.C. 2953.72(A)(8); *State v. Scott,* 2022-Ohio-4277. The decision depends on the facts of each case. *State v. Barnette,* 2024-Ohio-1172, ¶31 (7th Dist.). An appellate court must affirm the decision unless we find that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Elsass v. Shelby Cty. Bd. of Commrs.,* 92 Ohio St.3d 529.

{¶26} In this case, there is no dispute that Defendant is an eligible offender and that DNA testing was already done on the two articles of clothing he seeks to retest: the onesie and his T-shirt. In its second Journal Entry, the trial court concluded that the prior DNA testing "clearly established the biological material belonged to the Defendant" and that the trial record and jury verdict established that Defendant was the perpetrator. Although the trial court did not expressly specify the statutory basis for which it was rejecting Defendant's application, it concluded the original testing was definitive. As a result, it was required to reject the application.

{¶27}  A definitive DNA test is defined, in pertinent part, as follows:

a DNA test that clearly establishes that biological material from the perpetrator of the crime was recovered from the crime scene and also clearly establishes whether or not the biological material is that of the eligible offender. A prior DNA test is not definitive if the eligible offender proves by a preponderance of the evidence that because of advances in DNA technology there is a possibility of discovering new biological material from the perpetrator that the prior DNA test may have failed to discover. Prior testing may have been a prior "definitive DNA test" as to some biological evidence but may not have been a prior "definitive DNA test" as to other biological evidence.

R.C. 2953.71(U).

{¶28} Accordingly, the prior DNA test must clearly establish that it recovered biological material from the perpetrator, and it must then clearly establish that it did or did

not come from the offender. In other words, it "appears that the statute is intended not to allow a repeat test when the defendant already has a positive DNA test that connects the offender to the crime scene." *State v. Blair,* 2018-Ohio-4041, ¶ 11 (2d Dist.).

{¶29} At trial, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation ("BCI") testified regarding the testing that was performed and the results he determined. He stated that they first isolate the stain and extract DNA from the cells. They next determine how much DNA Is present. They then "amplify sixteen different regions along the DNA strand" and develop a profile so they can make comparisons of these regions with known DNA. The work is then peer reviewed by another court qualified analysist and administratively reviewed by a superior.

{¶30} In this case, the DNA testing established that biological material from someone other than the child and the mother was recovered from the crime scene. The State's report provided that the DNA profile from the swabs used on the underarm of the onesie was a mixture of at least two individuals. The major DNA profile was consistent with the child. The partial minor profile was consistent with contributions from Defendant and the mother. The Defendant could not be excluded as a contributor. Based on the national database provided by the Federal Bureau of Investigation, the report stated that the proportion of the population that could not be excluded was 1 in 4,919 unrelated individuals. At trial, Defendant did not provide an expert witness to refute either the interpretation of the DNA profiles or the statistical techniques used to make the conclusions.

{¶31} The mother testified that she put her child to bed sometime after 11:00 p.m., and awoke to find her missing at 4:00 a.m. In addition to the mother's expected

DNA, another person's DNA would indicate a person picked the child up at some point between 11:00 p.m. and noon the next day when she was found. The test clearly established biological material that came from the child in the major profile and a mixture of two people in the minor profile. The minor profile was consistent with the mother and Defendant.

{¶32} Further, the DNA profile from the hip of Defendant's T-shirt was a mixture of at least three individuals, including partial minor profiles consistent with contributions from the child and another unknown individual. Although the proportion of the population that could not be excluded as possible contributors was lower at 1 in 88 unrelated individuals, the child could not be excluded as a contributor to the DNA.

{¶33} Defendant has argued that the trial court abused its discretion in determining that the prior testing was definitive because he claimed it did not clearly establish that the biological material belonged to him. He cited *State v. Thomas,* 2017-Ohio-8011, for the proposition that for a DNA sample may not be attributed to a particular individual unless the sample matches that individual's DNA "with a less than 1 in 30 billion probability that the DNA comes from another source."

{¶34} In *Thomas,* the Court was not addressing R.C. 2953.71(U) and post-conviction DNA testing. Instead, it was determining if evidence of a knife collection was admissible when the evidence against the defendant in a murder was case was circumstantial and lacked overwhelming evidence of guilt. When analyzing the evidence, the Court concluded that there was no corroborating, probative, scientific, or forensic evidence to connect Thomas with DNA found on the victim. *Thomas, 2017-Ohio-8011,* at ¶ 46. In reviewing the DNA testing, the Court noted the statistical frequency of the DNA

on the victim's underwear would be found in 1 in 10 males and the DNA on the swab would be found in 1 of 926 males. *Id.* at ¶ 26. An expert indicated that he would attribute DNA to a source only when there is less than a 1 in 30 billion probability of a match.

{¶35} Defendant contends that DNA testing introduced at his trial "yielded DNA profiles that fell so short of being attributable to any one person." Defendant cites two more cases with similar statistical frequencies: *State v. Eckard*, 2016-Ohio-5174 (3d Dist.) (1 in 37,130,000,000) and *State v. Jordan,* 2016-Ohio-603 (2d Dist.) (1 in 562,700,000,000,000,000). The only two cases cited in the State's response yield similar results: *State v. Martin*, 2018-Ohio-1843 (8th Dist.) (1 in 1,000,000,000,000) and *State v. Barnette,* 2024-Ohio-1172 (7th Dist.) (1 in 39,000,000,000).

{¶36} In this case, on cross examination, Defendant's counsel specifically asked the State's expert if they see higher numbers in DNA results. The witness answered that "in some cases they do." He was clear, however, that the DNA found was "consistent" with the profiles.

{¶37} Pursuant to the test results, Defendant is included as a contributor of biological material recovered from the clothing. With DNA testing, the results can be categorized in three ways. The results can include a defendant, exclude a defendant, or be inconclusive. In this case, Defendant could not be excluded. R.C. 2953.71(I) defines "inclusion" as follows:

> "Inclusion" or "inclusion result" means a result of DNA testing that scientifically cannot exclude, or that holds accountable, the subject offender as a contributor of the biological material recovered from the crime scene or victim in question, in relation to the offense.

{¶38} Absent a specific statistical frequency for what "clearly establishes whether or not the biological material is that of the eligible offender," this Court defers to the discretion of the trial court to determine whether the testing was definitive on a case by case basis. Based on expert testimony that the DNA was consistent with the Defendant's, the trial court ruled that a determinative test had already taken place. As a result, it was required to reject the application.

{¶39} Even if the test reflected DNA from both the perpetrator and the defendant, R.C. 2953.71(U) states that a prior DNA test is not definitive if the eligible offender proves by a preponderance of the evidence that because of advances in DNA technology there is a possibility of discovering new biological material from the perpetrator that the prior DNA test may have failed to discover. It provides:

> In addition to a result that reflects both the perpetrator and the defendant, A prior DNA test is not definitive if the eligible offender proves by a preponderance of the evidence that because of advances in DNA technology there is a possibility of discovering new biological material from the perpetrator that the prior DNA test may have failed to discover. Prior testing may have been a prior "definitive DNA test" as to some biological evidence but may not have been a prior "definitive DNA test" as to other biological evidence.

R.C.2953.71(U). This puts the burden on the offender to prove that there are advances in technology that would make it possible to discover new biological material. *State v. Barnette,* 2024-Ohio-1172 (7th Dist.).

{¶40} In this case, Defendant did not produce any evidence as to what specific tests were available or that they would exclude him rather than just change the odds of consistency. Although he stated that a more advanced form of the polymerase chain reaction technique would reveal more of the DNA information and allow a more accurate comparison, the results would have to exclude him as a possible contributor. He failed to

present any evidence about advances in DNA technology that would determine the DNA on the onesie was not his or that the DNA on his T-shirt was not the child's.

{¶41} The statutory language in R.C. 2953.71(U) came about after the Ohio Supreme Court's decision in *State v. Prade.* In that case, an expert witness testified that the best source of the perpetrator's DNA would come from a lab coat that was over a bite mark made on the murder victim's arm. At the time of the initial trial, the DNA from the victim's blood overwhelmed or diluted the DNA from the biter's cells. Although an expert at trial testified other DNA would have been important in identifying the killer, the bite mark showed only the victim's DNA. As a result, the defendant's DNA was excluded.

{¶42} Ten years later, the defendant filed a post-conviction application for new DNA testing. He provided expert testimony that a new test was available which could isolate male DNA and overcome the female DNA that was present, potentially leading to the discovery of the killer. The Ohio Supreme Court held that the prior DNA test was not definitive when a new DNA testing method could detect information that could not be detected by the prior DNA testing methods. *Prade*, 2010-Ohio-1842, at ¶ 30.

{¶43} In *State v. Biggs,* 2013-Ohio-3333 (5th Dist.), ¶ 15, this Court analyzed a defendant's request for DNA testing and determined that, even with experts testifying on his behalf, the defendant did not establish any new testing method that was "innovative, advanced or new scientific test or form of analysis unavailable at the defendant's trial." The Court concluded that, based on the Supreme Court's holding in *Prade,* the defendant failed to meet his burden required for the resubmission of the tissue slides for DNA testing. *Id.* at ¶ 20.

{¶44} It is important to note that the Ohio Supreme Court limited its holding in *Prade* "to situations in which advances in DNA testing have made it possible to learn information about DNA evidence that could not even be detected at the earlier trial." *Prade* at ¶ 29. It expressly noted that it did not have before it "the issue of whether to allow new DNA testing in cases in which a prior DNA test provided a match *or otherwise provided meaningful information* and the inmate is simply asking for a new test using the latest testing methods." (Emphasis added). *Id.*

{¶45} This is the very situation we have in this case. The DNA profile was consistent with Defendant such that he could not be excluded. Defendant did not provide any evidence that there were specific tests available that would exclude his DNA from consideration.

{¶46} The prior DNA testing on the onesie was consistent with the child, the mother, and Defendant. The prior DNA testing on the T-shirt was consistent with the Defendant, another individual, and the child. The results provided meaningful information as to who touched the child the night she went missing. The trial court did not abuse its discretion in determining that the prior DNA test was definitive. It was therefore statutorily required to reject new testing. Similarly, Defendant did not meet his burden of proving the prior tests were not definitive and the trial court did not err in refusing to accept his application.

{¶47} Even if the prior test had not been a definitive DNA test, the statutory scheme still prevents the trial court from accepting the application unless

> the offender shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case as described in division (D) of this section would have been outcome determinative at the trial stage in that case.

R.C. 2953.74(B)(2). "Outcome determinative" has been defined, in pertinent part, as if the results of DNA testing had been presented at the trial and they had been analyzed along with all available admissible evidence related to the offender's case, "there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense." R.C. 2953.71(L).

{¶48}   In *State v. Swanson,* the defendant wanted to have a cigarette butt found at the crime scene tested. This Court determined that for the trial court to find that DNA evidence on the cigarette butt was outcome determinative, it would have to disregard all the identification evidence provided at trial by the victims and witnesses. A review of the record establishes that this evidence was substantial and therefore, the trial court did not abuse its discretion when the court determined that DNA testing would not be outcome determinative. *State v. Swanson*, 2005-Ohio-5471, ¶ 14, aff'd, 2007-Ohio-1383; *see also State v. Wilson,* (exclusion would not strengthen a defendant's innocence claim when the jury had convicted him without DNA evidence).

{¶49} In this case, even if the DNA profiles were excluded on the respective items, Defendant could not demonstrate that there was a "strong probability" that no reasonable factfinder would have found him guilty. While the DNA results indicated the Defendant was holding the child, the jury heard additional evidence throughout the trial.

{¶50} The admissible evidence in this case included testimony that Defendant knew the mother and her child because he had previously rented garage space on the mother's property. It was unrefuted that the night the child was abducted, Defendant had borrowed a friend's van around midnight. The same van was found 500 feet from where

the child was found. Tire castings recovered from behind the child's house were consistent with the tires on the van. The child was wrapped in a comforter that the van's owner's had placed in the back of the van. There was a sheet in the van that matched the one that had been on the child's bed.

{¶51} An eyewitness described seeing someone walking alongside the road away from the area where the child had been left at around 4:00 a.m. The person he saw had similar characteristics to Defendant. Surveillance video from two separate gas stations placed Defendant in the same area moving in a direction away from where the child was found. Sometime after 5:00 a.m., appellant made a phone call from a gas station saying he needed a ride. When he was arrested at the gas station, he had mud on his shoes that was later deemed consistent with mud samples taken from the location where the van was recovered.

{¶52} The jury heard evidence from a forensic analyst for the Ohio BCI that he detected the presence of amylase, an enzyme, on the baby's diaper. According to the analyst, amylase is present in saliva and is approximately 50 times more concentrated in saliva than in any other body fluid. Despite the presence of amylase, the BCI could not develop a sufficient profile to draw any conclusions regarding the source of the DNA. The jury also heard evidence from a physician that there was a tiny tear in front of the child's hymen, a tiny amount of bleeding, and redness to the area. The injury was not any type of skin irritation. A nurse practitioner testified that the injury was very concerning for sexual abuse or assault.

{¶53} Defendant applied for DNA testing to the Muskingum County Court of Common Pleas, the trial court that sentenced him. In this case, male DNA would not be

on the child's onesie unless the man was holding the child, as the perpetrator of the kidnapping must have done. The trial court found the DNA test established that the biological material recovered was consistent with Defendant's DNA profile. Therefore, the trial court determined that it must reject Defendant's Application for DNA Testing pursuant to R.C. 2953.74.

{¶54} Defendant's final argument is that the trial court abused its discretion "in the way it handled the Defendant's Application for DNA testing" because it "never gave the Defendant's Application the attention it deserved." He based his claim on the fact that the court initially denied the application without explanation.

{¶55} R.C. 2953.73 provides what materials the court must review in making its determination. It states:

> [The court] shall consider the application, the supporting affidavits, and the documentary evidence and, in addition to those materials, shall consider all the files and records pertaining to the proceedings against the applicant, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript and all responses to the application filed under division (C) of this section by a prosecuting attorney or the attorney general, unless the application and the files and records show the applicant is not entitled to DNA testing, in which case the application may be denied.

{¶56} In its Journal Entry, the court referenced the tests and the extensive trial record. There were no supporting affidavits attached to the application. There is nothing to indicate that the trial court did not properly consider this matter in reaching its conclusion.

{¶57} We find the trial court did not abuse its discretion in rejecting Defendant's application for DNA testing pursuant to R.C. 2953.74(A). The sole assignment of error is overruled.

## CONCLUSION

{¶58}   The judgment of the Muskingum County Court of Common Pleas is affirmed.


By:  Delaney, P.J.,

Wise, J. and

Baldwin, J., concur.