[Cite as *State v. Eckard*, 2016-Ohio-5174.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                  CASE NO. 9-15-45

     v.

BRYSON A. ECKARD,                  O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 15CR0206

**Judgment Affirmed**

**Date of Decision: August 1, 2016**

APPEARANCES:

    *Kevin P. Collins* **for Appellant**

    *Adam D. Meigs* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Bryson A. Eckard ("Eckard"), appeals the October 22, 2015 judgment entry of the Marion County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} On May 7, 2015, the Marion County Grand Jury indicted Eckard on three counts, including:  Count One of burglary in violation of R.C. 2911.12(A)(2), a second-degree felony, Count Two of theft of firearms in violation of R.C. 2913.02(A)(1), a third-degree felony, and Count Three of theft of drugs in violation of R.C. 2913.02(A)(1), a fourth-degree felony.  (Doc. No. 1). The indictment contained a firearm specification as to Counts One and Two.  (*Id.*).

{¶3} On May 11, 2015, Eckard appeared for arraignment and entered pleas of not guilty.  (Doc. No. 5).

{¶4} On August 21, 2015, Eckard filed a request for a bill of particulars, which the State filed on September 16, 2015.  (Doc. Nos. 25, 43).

{¶5} On September 17, 2015, a jury trial was held.  (Sept. 17, 2015 Tr. at 1).  The jury found Eckard guilty of the burglary offense and not guilty of the theft-of-firearms and theft-of-drugs offenses.[1]  (Sept. 17, 2015 Tr. at 175-176); (Doc. Nos. 45, 46, 47).  The trial court filed its judgment entry of conviction and sentence on October 22, 2015.  (Doc. No. 52).  The trial court sentenced Eckard

---

[1] The State moved to amend the indictment by withdrawing the firearm specification as it applied to Count One, and the indictment was amended.  (Sept. 17, 2015 Tr. at 176).

to three years in prison and ordered that Eckard serve the term consecutively to the sentence imposed in another Marion County case. (*Id.*).

{¶6} Eckard filed his notice of appeal on November 20, 2015. (Doc. No. 59). He raises two assignments of error for our review, which we will address together.

### Assignment of Error No. I

**The Record Contains Insufficient Evidence to Support Defendant-Appellant's Conviction for Burglary in Violation of R.C. 2911.12(A)(2) and Therefore Violates the Constitutions of the United States and of the State of Ohio.**

### Assignment of Error No. II

**Defendant-Appellant's Conviction for Burglary in Violation of R.C. 2911.12(A)(2) is Contrary to the Manifest Weight of the Evidence and Therefore Violates the Constitutions of the United States and of the State of Ohio.**

{¶7} In his first and second assignments of error, Eckard argues that his burglary conviction is based on insufficient evidence and is against the manifest weight of the evidence. In particular, Eckard argues that there is insufficient evidence that he was the person who committed the burglary. In his manifest-weight-of-the-evidence argument, Eckard challenges the weight that was accorded to the DNA evidence.

**{¶8}** Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). As such, we address each legal concept individually.

**{¶9}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

**{¶10}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

R.C. 2911.12(A)(2) sets forth the offense of burglary and provides:

(A)  No person, by force, stealth, or deception, shall do any of the following:

* * *

(2)  Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a

permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense.

{¶11} Eckard does not dispute the evidence concerning the underlying elements of the burglary offense of which he was convicted; rather, he disputes the issue of identity as to the conviction. *See State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 13. *See also State v. Littlejohn*, 8th Dist. Cuyahoga No. 101549, 2015-Ohio-875, ¶ 30. As such, we will address only the identity element of the offense. *Missler* at ¶ 13, citing *State v. Carter*, 2d Dist. Montgomery No. 25447, 2013-Ohio-3754, ¶ 9-12. "'It is well settled that in order to support a conviction, the evidence must establish beyond a reasonable doubt the identity of the defendant as the person who actually committed the crime at issue.'" *Id.*, quoting *State v. Johnson*, 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, ¶ 27, citing *State v. Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 19, and *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11.

{¶12} At trial, the State offered the testimony of Lieutenant Shane Gosnell ("Lieutenant Gosnell") of the Marion Police Department. (Sept. 17, 2015 Tr. at 56-57). Lieutenant Gosnell testified that he responded to a burglary of a residence located at 487 East Farming Street in Marion on November 25, 2014. (*Id.* at 57).

He testified that he discovered a safe in the bedroom closet that was pried open with "some type of tool." (*Id.* at 59).

{¶13} According to Lieutenant Gosnell, a witness reported to him that he saw two suspicious people running from the backside of the house, and the witness described a white van and its license-plate number that he believed was involved in the burglary. (*Id.* at 58). Lieutenant Gosnell investigated the witness's report regarding the van by running the license-plate number provided by the witness, which was associated with an address on Libby Lane in Marion. (*Id.* at 60). Lieutenant Gosnell went to the Libby Lane address and observed a van at that address, which was a different make and color than the description provided by the witness. (*Id.* at 60-61).

{¶14} While Lieutenant Gosnell was investigating the witness's report, he received a phone call from the victim homeowner, Gary Lanthron ("Gary"), explaining that Gary discovered a crowbar that "was foreign to the scene and probably brought by the people that were involved." (*Id.* at 61). Lieutenant Gosnell returned to the scene, and Gary brought the crowbar, which was discovered in the bedroom, out to Lieutenant Gosnell. (*Id.*). Lieutenant Gosnell identified State's Exhibit 1 as the crowbar Gary discovered in the bedroom. (*Id.* at 62, 64). Lieutenant Gosnell identified State's Exhibit 2 as photographs that he took of the scene as it appeared on November 25, 2014. (*Id.* at 65, 69). In

particular, of those photographs, Lieutenant Gosnell identified one photograph as depicting a green gun safe with yellow paint transfer—matching the yellow paint from the crowbar—on the area that was pried open. (*Id.* at 68). He also testified that there is green paint transfer on the crowbar. (*Id.* at 69). Lieutenant Gosnell testified that the crowbar appears to be the tool which was used to pry open the gun safe. (*Id.*).

{**¶15**} Lieutenant Gosnell testified that he sent the crowbar to the Bureau of Criminal Investigation ("BCI") to be tested for DNA evidence. (*Id.* at 69-71). According to Lieutenant Gosnell, BCI identified Eckard's DNA as being on the crowbar. (*Id.* at 72). BCI identified the DNA as matching Eckard's DNA because Eckard's DNA was in the "CODIS" database—the database used to collect DNA samples from criminal offenders. (*Id.* at 71-72). Because BCI discovered Eckard's DNA on the crowbar, Lieutenant Gosnell testified that he asked Eckard to voluntarily submit a "standard" DNA sample to compare to the DNA found on the crowbar. (*Id.* at 72-73). At the time Lieutenant Gosnell asked Eckard to submit his DNA sample, Lieutenant Gosnell also asked Eckard about the burglary and why Eckard's DNA was found on the crowbar to which Eckard responded, respectively, that he was not involved in the burglary and that he did not know how his DNA got onto the crowbar. (*Id.*). Lieutenant Gosnell testified that, because Eckard did not voluntarily provide a DNA sample, law enforcement

obtained a search warrant for Eckard's DNA and obtained the sample of Eckard's DNA, which matched the DNA found on the crowbar. (*Id.* at 75).

{¶16} Lieutenant Gosnell testified that he spoke with Gary to see if there would be any reason why Eckard's DNA would be found in his house, but Gary told him that "he was not familiar with [Eckard]." (*Id.*). According to Lieutenant Gosnell, Gary had a video surveillance system surveilling his residence. (*Id.* at 60).

{¶17} On cross-examination, Lieutenant Gosnell testified that the crowbar appears to be a used crowbar exhibiting a lot of wear. (*Id.* at 76). Lieutenant Gosnell testified that the witness described that he saw "two * * * white male subjects run from the area, then he saw the white van leave, believing that they got into it, with a female driver, and * * * he also saw a black male in the area, but * * * wasn't sure [of] his involvement." (*Id.* at 77). Lieutenant Gosnell further testified that the witness described one of the white males as wearing a black shirt and the other as wearing a white shirt. (*Id.*). He testified that the white van described by the witness was not connected to Eckard. (*Id.* at 78). Lieutenant Gosnell testified that the burglars appeared to have worn gloves because law enforcement were unable to find any fingerprint evidence. (*Id.* at 79). According to Lieutenant Gosnell, one of the burglars was identified as Zach Ballard ("Ballard") from the distinctive clothing he was wearing during the burglary,

which matched the clothing that the suspect in a different theft was wearing. (*Id.* at 80).

{¶18} On redirect examination, Lieutenant Gosnell testified that the white van that the witness described was determined not to be involved with the burglary—it is registered to a woman who provided law enforcement an alibi for the time of the burglary. (*Id.* at 85). He also testified that the information provided to him by the witness "didn't pan out." (*Id.*).

{¶19} On re-cross examination, Lieutenant Gosnell testified that he observed "both suspects wearing gloves" from Gary's surveillance video. (*Id.* at 86-87).

{¶20} The State also called Lieutenant Matt Bayles ("Lieutenant Bayles") of the Marion Police Department who testified that he responded to the Farming Street burglary. (*Id.* at 87-88). Lieutenant Bayles testified that he copied with his phone's video camera the video depicting the burglary from Gary's surveillance system. (*Id.* at 88). Lieutenant Bayles identified State's Exhibit 3 as the video he recorded with his phone of the surveillance video. (*Id.* at 90). According to Lieutenant Bayles, the video depicts three burglars in the house—one wearing a light-colored jacket with black gloves, one with a light-colored jacket carrying something in his left hand, and one wearing a plaid coat or sweater. (*Id.* at 90-92). He testified that it did not appear that the burglar carrying the object in his left

hand was wearing gloves. (*Id.* at 91). He also testified that he could not identify from the video what that burglar was carrying in his left hand. (*Id.* at 91-92).

{¶21} On cross-examination, Lieutenant Bayles testified that he assumed that the burglars were familiar with the house because they were wearing masks, and typical home burglars do not wear masks "unless they knew that there was [sic] cameras in the house." (*Id.* at 93). Also, Lieutenant Bayles testified that he assumed that the burglars were familiar with the house because a hinged-top coffee table was opened during the burglary, which Gary pointed out to him "that only somebody that knew this was this way would ever do that." (*Id.* at 94).

{¶22} The State called as its next witness, Timothy Augsback ("Augsback"), a DNA analyst with BCI. (*Id.* at 102). Augsback testified that he tested the "evidence sample"—the crowbar—for DNA evidence. (*Id.* at 109). He testified, "Eckard was included as the major donor of the DNA and the statistic, based on the national database provided by the FBI, the expected frequency of occurrence of the DNA profile is 1 in 37 billion 130 million unrelated individuals." (*Id.* at 112). Augsback explained, "[I]f I were to test five times the word population[, of] that number of individuals I would expect to encounter this DNA profile one time." (*Id.*). However, according to Augsback, the FBI updated its database after he first prepared his report. (*Id.* at 111). Augsback retested the DNA profile in accordance with the updated FBI database and produced the same

statistic. (*Id.* at 113). Augsback testified that, as a result of his DNA analysis, "Eckard was included in the DNA profile from the crowbar." (*Id.*). Augsback identified as State's Exhibit 4 the report he prepared reflecting his DNA analysis. (*Id.* at 114).

{¶23} On cross-examination, Augsback testified that "major donor" means "that the DNA profile was a mixture, the major donor was consistent with Bryson Eckard, and then there was additional minor data that was not suitable for comparison." (*Id.* at 116-117). Augsback testified that it is possible that DNA could be transferred to the crowbar if it was handled by someone wearing gloves—a secondary DNA transfer, which is "not necessarily a good source of DNA on evidentiary items." (*Id.* at 117). Augsback testified that he does not know when Eckard's DNA was deposited on the crowbar and that DNA does not have a "shelf life." (*Id.* at 117-118). He further testified that Eckard was not the only person to touch the crowbar. (*Id.* at 118).

{¶24} On redirect examination, Augsback clarified that his conclusion that Eckard was a major donor meant

> that there's a mixture, meaning multiple contributors to the DNA
> profile, and a major indicates that one contributor was stronger than
> the rest of the information. So one of the individuals, pieces of
> information stood out, and then the remaining pieces of information

were not sufficient for comparison, so I would not be able to make any assessments as to who else had contributed to that DNA.

(*Id.* at 119).

{¶25} As its next witness, the State called Gary, who testified that his home was burglarized just before Thanksgiving in 2014. (*Id.* at 121). Gary testified that he discovered the crowbar "laying on the bed" and that his gun safe had been pried open. (*Id.* at 123-124). Gary identified as State's Exhibit 1 the crowbar that he discovered on his bed. (*Id.* at 124). Gary testified that he reviewed the surveillance video and saw from the video that three people burglarized his house. (*Id.* at 125). Gary identified as State's Exhibit 3 the surveillance video which was then played for the jury. (*Id.* at 126).

{¶26} On cross-examination, Gary testified that he is not familiar with Eckard. (*Id.* at 129).

{¶27} Finally, the State called Connie Lanthron ("Connie") who testified that she and Gary discovered the crowbar at the foot of their bed. (*Id.* at 130, 133). Connie testified that she did not recognize the crowbar and told Gary "to call the Officer back out because [she] knew it wasn't [theirs]." (*Id.* at 133). Connie identified as State's Exhibit 1 the crowbar that she and Gary discovered at the foot of their bed. (*Id.* at 134). Connie testified that she did not know Eckard but that she has "seen him down the street a couple times." (*Id.*).

{¶28} Thereafter, the State moved to admit its exhibits, which were admitted without objection, and rested. (*Id.* at 135-136). Next, Eckard made a Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 136-137). Eckard did not provide any evidence, rested, and renewed his Crim.R. 29(A) motion, which was denied. (*Id.* at 137-138). The case was submitted to the jury, which found Eckard guilty as to Count One of the indictment and not guilty as to Counts Two and Three of the indictment. (*Id.* at 174-176).

{¶29} We first review the sufficiency of the evidence supporting Eckard's burglary conviction. *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). In support of his sufficiency-of-the-evidence challenge, Eckard argues that a rational trier of fact could not have found that he "was present in the Lanthron residence and committed a burglary." (Appellant's Brief at 10). In particular, Eckard argues that: (1) "[t]he video provides no evidence sufficient to support [his] conviction"; (2) the testimony of the State's witnesses "provides no evidence to connect [him] to the burglary"; and (3) the DNA evidence recovered from the crowbar is not sufficient to support his conviction because the crowbar "exhibited quite a bit of wear" and because his DNA profile was not the only DNA profile found on the crowbar. (Appellant's Brief at 10-14).

{¶30} Despite Eckard's argument that his conviction is based on insufficient evidence because none of the State's witnesses identified him as the person who committed the burglary, "[t]here is no requirement that a defendant be specifically identified as the perpetrator of a crime by a witness in testifying in court to uphold his conviction for that crime." *Littlejohn*, 2015-Ohio-875, at ¶ 37, citing *State v. Brown*, 8th Dist. Cuyahoga No. 98881, 2013-Ohio-2690, ¶ 30 and *State v. Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 19. Rather, "'direct or circumstantial evidence is sufficient to establish the identity of a defendant as the person who committed a crime.'" *Missler*, 2015-Ohio-1076, ¶ 13, quoting *Collins* at ¶ 19, citing *Lawwill*, 2008-Ohio-3592, at ¶ 11. "'Circumstantial evidence' is the 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning or other facts.'" *Lawwill* at ¶ 12, quoting *State v. Wells*, 12th Warren No. CA2006-02-029, 2007-Ohio-1362, ¶ 11, citing *State v. Griesheimer*, 10th Dist. Franklin No. 05AP-1039, 2007-Ohio-837, ¶ 26. Circumstantial evidence has no less probative value than direct evidence. *Griesheimer* at ¶ 26, citing *Jenks*, 61 Ohio St.3d 259, at paragraph one of the syllabus. *See also State v. Heinish*, 50 Ohio St.3d 231, 238 (1990) ("This court has long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.").

{¶31} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Eckard was the person who committed the burglary. Gary and Connie testified that they found a crowbar, which they did not recognize as belonging to them, in their bedroom after the burglary. Lieutenant Gosnell testified that he observed yellow paint transfer, matching the paint color of the crowbar, on Gary's green gun safe, which was pried open during the burglary. Lieutenant Gosnell also testified that he observed green paint transfer, matching the paint color of the gun safe, on the crowbar. Based on the reciprocating paint transfer, Lieutenant Gosnell testified that it appeared that the crowbar was used to pry open the gun safe. (*See also* State's Exs. 1, 2).

{¶32} Eckard's DNA was discovered on the crowbar. Although multiple DNA profiles were on the crowbar, Eckard's DNA profile was the only DNA profile determined to be a major contributor. Augsback testified that a major-contributor profile means that DNA profile is "stronger" than the other profiles on the crowbar—that is, the major DNA profile "stood out" while the other profiles were insufficient for comparison. Eckard provided to law enforcement a standard DNA sample, which matched the DNA profile found on the crowbar. Augsback testified that the major contributor to the DNA profile on the crowbar has a frequency of occurrence of 1 in 37,130,000,000—that is, the major contributor to

the DNA profile on the crowbar would be encountered once in a test of five times the world population.

{¶33} DNA evidence identifying a defendant as a major contributor to the DNA profile found on an object linked to a crime is sufficient evidence to sustain a conviction. *Brown* at ¶ 31, 35 (concluding that Brown's convictions were based on sufficient evidence because his DNA profile was the major contributor to the DNA profile discovered on a shirt connected to the crimes even though the DNA profile on the shirt also revealed the DNA of unidentified minor contributors); *State v. Crabtree*, 9th Dist. Summit No. 24946, 2010-Ohio-2073, ¶ 17, 19 (concluding that a rational trier of fact could have concluded that Crabtree committed the crimes because his DNA was consistent as the major contributor to the DNA profile discovered on a gun that was connected to the crimes); *State v. Bridgeman*, 2d Dist. Champaign No. 2010 CA 16, 2011-Ohio-2680, ¶ 16, 18 (concluding that a reasonable trier of fact could have concluded that Bridgeman committed the bank robbery because DNA testing of a ski mask and glove connected to the robbery revealed Bridgeman as the major contributor to the DNA profile discovered on the glove and the ski mask). *See also State v. Johnson*, 5th Dist. Stark No. 2012 CA 00054, 2012-Ohio-5621, ¶ 25 (concluding that "the jury could have concluded that [Johnson] and his cohort invaded the home" because

Johnson's DNA was discovered on a hat that the victim identified as the hat "worn by the man who held the gun to his head").

**{¶34}** The surveillance video of the burglary depicts one of the burglars carrying an object in his left hand. Further, it is not apparent from the video whether that burglar is wearing gloves. Even if the surveillance video is alone insufficient to identify Eckard as the person who committed the burglary, the totality of the State's evidence, particularly considering the DNA evidence, "could well have convinced the jury that 'the application of various facts formed a larger picture that, when viewed as [a] whole, made a compelling case for [Eckard's] guilt.'" *Littlejohn*, 2015-Ohio-875, at ¶ 39, quoting *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 19.

**{¶35}** Accordingly, a rational trier of fact have found beyond a reasonable doubt that Eckard was the person who committed the burglary based on the testimony of the State's witnesses, the scientific evidence establishing that Eckard was the major contributor to the DNA profile found on the crowbar, and the surveillance video. That is, a rational trier of fact could have found that Eckard used the crowbar to pry open the gun safe during the burglary and was one of the men seen in the surveillance video burglarizing the Lanthron residence. *See id.* at ¶ 39.

{¶36} Having concluded that Eckard's conviction is based on sufficient evidence, we next address Eckard's argument that his convictions are against the manifest weight of the evidence. *Velez*, 2014-Ohio-1788, at ¶ 76. Eckard makes many of the same arguments that he makes in support of his sufficiency-of-the-evidence assignment of error. In particular, Eckard points to the following evidence as weighing against his conviction: (1) there were other contributors to the DNA profile discovered on the crowbar; (2) the conflicting testimony that the burglars were familiar with the residence and Gary and Connie's testimony that they did not know Eckard; (3) none of the State's witnesses identified Eckard as the person who committed the burglary; (4) there is no evidence as to how long Eckard's DNA evidence had been on the crowbar or where Eckard was when it was deposited on the crowbar; and (5) the report of the witness did not implicate Eckard.

{¶37} "Even removing the lens of favorability in favor of the prosecution, through which we examine the sufficiency of the evidence, this is not an exceptional case where the evidence weighs heavily against the convictions." *State v. Suffel*, 3d Dist. Paulding No. 11-14-05, 2015-Ohio-222, ¶ 33. Although the State's case against Eckard is not overwhelming, the evidence that we summarized in our sufficiency-of-the-evidence analysis supporting Eckard's conviction is weightier than the evidence against it.

**{¶38}** Eckard focuses the majority of his manifest-weight argument challenging the weight that should be afforded to the DNA evidence. While there was DNA of unidentified individuals as "minor" contributors to the DNA profile discovered on the crowbar, the evidence that Eckard's DNA being the major contributor to the DNA profile discovered on the crowbar is weightier than those other minor profiles. *See Bridgeman*, 2011-Ohio-2680, at ¶ 36, 40. Eckard's DNA was determined to be the only major contributor to the DNA profile discovered on the crowbar—the other "minor" DNA data was not suitable for comparison. *Littlejohn*, 2015-Ohio-875, at ¶ 34 (concluding that "the fact that the DNA profile on the gloves was a mixture of major and minor contributors— including in addition to Littlejohn's DNA as the major contributor, the DNA of at least one other, unidentified individual as a minor contributor—does not warrant overturning Littlejohn's convictions"). Likewise, Augsback's testimony established that, out of the entire population of the world five times over, only one person would be expected to match the major contributor to the DNA profile discovered on the crowbar—Eckard. *Compare Crabtree*, 2010-Ohio-2073, at ¶ 23 (concluding that it was reasonable for the jury to conclude that Crabtree was responsible for the crimes since "the DNA evidence was consistent with Crabtree's, and testimony establishing that out of the entire population alive, only one person would be expected to match the DNA profile on the gun"). Despite

Lieutenant Gosnell informing Eckard that his DNA was discovered on a crowbar found at a crime scene, Eckard denied to Lieutenant Gosnell any knowledge of how his DNA was deposited on the crowbar. The jury did not need to guess how Eckard's DNA was deposited on the crowbar and can infer from the totality of the evidence presented at trial that Eckard was one of the men who participated in the burglary. *See Brown*, 2013-Ohio-2690, ¶ 33.

{¶39} Furthermore, because Eckard's DNA was found on the crowbar that was found at the crime scene, it was permissible for the jury to infer a link between Eckard and the crime scene. *See James*, 2012-Ohio-966, at ¶ 23; *Brown* at ¶ 42. Although the crowbar exhibited a lot of wear, as we stated above, Eckard was identified as the major contributor to the DNA profile discovered on the crowbar. That the State's witnesses did not identify Eckard as the person who committed the burglary is a matter for the trier of fact to weigh. *See Williams*, 2011-Ohio-4760, at ¶ 24. Also for the jury to weigh is the witness's report to law enforcement that did not implicate Eckard. *See Bridgeman* at ¶ 35, 40.

{¶40} Likewise, the jury did not consider the DNA evidence in a vacuum—rather, the jury weighed the DNA evidence with the testimony of the State's witnesses and the surveillance video. *See Littlejohn* at ¶ 36, 39; *State v. Campbell*, 2d Dist. Montgomery No. 26575, 2016-Ohio-598, at ¶ 13. Indeed, the jury could

infer from the evidence presented at trial that Eckard was the most recent person to handle the crowbar. *See Bridgeman*, 2011-Ohio-2680, at ¶ 40; *Brown* at ¶ 35.

**{¶41}** Although the surveillance video clearly depicts the first burglar to enter the house wearing gloves, it is unclear from the video whether the second burglar is wearing gloves. The second burglar is shown carrying an object that could be the crowbar. The third burglar was identified as Ballard. The jury could infer that Eckard was the second burglar. *See State v. Gray*, 9th Dist. Summit No. 27365, 2015-Ohio-1248, ¶ 53 (concluding that Gray's conviction was not against the manifest weight of the evidence even though the jury was required to infer "from Mr. Gray's conduct on the video as to his actions outside the eye of the camera" because "[t]he jury was able to view the surveillance video in conjunction with the various witnesses' testimony").

**{¶42}** Eckard's reliance on the conflicting testimony concerning the burglars' familiarity with the Lanthron residence also does not demonstrate that the jury clearly lost its way creating a manifest miscarriage of justice. Despite Gary's testimony that he did not know Eckard and Connie's testimony that she recognized him only from seeing him down the street from her home, there were at least two other individuals that participated in the burglary that could have had knowledge about the Lanthron residence.

{¶43} For these reasons, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Eckard's convictions must be reversed and a new trial ordered.

{¶44} Eckard's assignments of error are overruled.

{¶45} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**