**[Cite as *State v. Schoewe*, 2023-Ohio-1598.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                                   Court of Appeals No. L-22-1124

      Appellee                                             Trial Court No.  CR0202001384

v.

David Jay Schoewe                                      **DECISION AND JUDGMENT**

      Appellant                                             Decided:  May 12, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, David Jay Schoewe, was

convicted of robbery by the Lucas County Court of Common Pleas and sentenced to an

indefinite term of a minimum of four years to a maximum of six years in prison.  For the

following reasons, we affirm.

## I.  Background

{¶ 2} Around 10:50 a.m. on Saturday, November 2, 2019, just before closing-time, the Trilby Branch of KeyBank, on Tremainsville Road in Toledo, was robbed.  The robbery was captured on video, beginning with the perpetrator's entrance into the building and ending with his exit into the parking lot.  The video, which was played for the jury, shows a man with a beard enter the bank, wearing a black Ohio State hooded sweatshirt and a black *Sons of Anarchy* hat.  The man steps up to a teller window where "H.D." was working and passes her a note.  The note, which was recovered at the scene, states, "[t]his is a robbery.  I have a gun.  Quietly with no alarm, open your drawer.  Give me large bills.  No dummy money, no die packs, nothing funny.  I don't want to hurt you.  You have 20 seconds."  At trial, H.D. testified that the robber's hand was in his pocket, "seeming like he had a gun."   H.D. "quickly" placed the money from her drawer on the counter, which the robber took, before absconding.

{¶ 3} When the robber had gone, H.D. yelled for the branch manager to lock the doors and that the bank had just been robbed.  Consistent with her training, she then began to write down every detail of what had just occurred.  H.D. described the robber as follows: "white male, very light distinctive eyes, had a black Ohio State sweatshirt on. Very short hair. Probably approximately 5'8, 5'9, right around there."  Under cross-examination, H.D. said that she could not recall if the robber was wearing gloves.

2.

{¶ 4} Toledo Police Officer Ronald Wilcox was one of the first officers to arrive at the scene. Upon exiting his vehicle, Officer Wilcox was met by bank customers, Steve Reutz and his wife. Reutz, who testified at trial, told Officer Wilcox that they learned of the robbery after-the-fact. But, once outside, they saw a person "running across the road," southbound. They also observed that the person "dropped a hat in the parking lot [of a veterinary clinic] across the street." According to Officer Wilcox, the couple described the person as a "white male about 5'7, * * * about 170 pounds" with a black hooded sweatshirt and a black hat. Officer Wilcox walked the "three, four hundred feet" where the hat was located and "protected" it until it could be collected by Sergeant Roy Kennedy.

{¶ 5} Toledo Police Detective Donald O'Brien was dispatched to the area south of the bank, specifically Tremainsville and Pawnee Streets. From his squad car, Detective O'Brien noticed a person, later identified as William Forsche, doing yard work. Forsche owns three adjacent rental properties and was preparing a unit to be rented. Detective O'Brien watched as Forsche "pick[ed] up some clothing" and was about "to put it * * * inside [a trash] bag or can." Detective O'Brien "hurried" and "jumped" out of his car and told Forsche "to place the items back where he found them." As instructed, Forsche put the items, described as "dark" clothing items, back in the side yard. After Forsche was told of the robbery, he recalled to the officer that, while cleaning an interior window, he saw a "gentleman * * * briskly walk by" about "three feet outside the window." At the

3.

time, Forsche wondered why the person didn't "just use the sidewalk." He described the person as a "younger, white male" with a "slim build" but did not see his face. Later, because Forsche had "touch[ed]" the clothing, a DNA sample from his cheek was taken to "eliminate [him] as a DNA suspect."

{¶ 6} When Detective O'Brien learned that a baseball hat had been found, he headed that way. As he walked, he came upon a pair of gloves "laying on the sidewalk" along Tremainsville. Meanwhile, after the officer left, Forsche found *another* piece of dark clothing, near the entrance to his building. This time, Forsche knew not to touch it and called 911 instead. Police returned to gather the article of clothing, later identified as a black Ohio State hooded sweatshirt.

{¶ 7} Sergeant Kennedy photographed and gathered evidence gathered along the perpetrator's "flight path." He testified that, "linearly," it appeared that the perpetrator "le[ft] the bank and [proceeded] down Tremainsville," first disposing of "the hat, then the gloves, then the sweatshirts." With respect to the two sweatshirts, found together, Kennedy testified that it "didn't look like they had been there very long [because] [t]hey just weren't wet or very dirty." The officer tagged them separately, "protecting them for DNA." He followed the same process with regard to the hat, gloves, and the Ohio State sweatshirt. Sergeant Kennedy also collected the robbery note and the bank surveillance video. At trial, Sergeant Kennedy testified that the *Sons of Anarchy* hat and the Ohio

4.

State sweatshirt—that he collected on the day of the robbery—and the hat and sweatshirt shown on the perpetrator standing at the teller window, appeared to be one and the same.

{¶ 8} Detective Kristi Eycke treated the robbery note with a chemical solution, for purposes of identifying whether any fingerprints were detectable. According to her, the prints lacked "sufficient rich detail" to do so.

{¶ 9} Appellant's mother-in-law, Kim Bell, also testified. Bell lives in the Upper Peninsula of Michigan where she is raising her two grandchildren, born to appellant and her daughter, Melinda Schoewe. Bell recalled that, on November 19, 2019—17 days after the robbery—Melinda called Bell's father (i.e. Melinda's grandfather) to ask that he meet them in Wisconsin. According to Bell, "[f]or some reason * * * [appellant and Melinda] were worried about something." Bell's father went to Wisconsin and "retrieved" the children. About a month later, appellant visited Bell's home for a "couple of days" to see his kids. By then, appellant and Melinda had "separated." After he had gone, Bell found some letters in a closet that appellant had written. One of them, a "love note" to Melinda, includes the statement, "don't tell anybody about anything we did in Toledo that can get us caught up, please." Bell gave the letter to the police. When police showed Bell a picture of the bank robber, she responded, "that's my son-in-law David Schoewe." At trial, Bell testified that, "[s]adly," she was "hundred percent" [sic] certain that it was "David." Bell has known appellant since he was five or six years old.

{¶ 10} Emily Feldenkris is a forensic scientist with the Ohio Bureau of Criminal Investigation ("BCI") and testified as an expert in the field of DNA forensic analysis. Soon after the robbery, Toledo Police sent the agency five "items of evidence": the gloves, the Ohio State sweatshirt, the baseball hat, and "the other" sweatshirts. Although samples were taken from each item, not all the samples were "examined." Feldenkris explained that, because the perpetrator was known to have been wearing an Ohio State sweatshirt and a *Sons of Anarchy* baseball hat, samples from those items were analyzed first. Feldenkris testified that BCI "received a suitable result that was sufficient for comparison" on samples taken from the collar and hood of the Ohio State sweatshirt (Item 3.2) and from the inside of the baseball hat (Item 4.1).

{¶ 11} The first notification of a "DNA match" came when Feldenkris entered a DNA profile, taken from the Ohio State sweatshirt, into the agency's data base in an "attempt to identify who that individual was. * * * The name that was returned was Melinda Rae Schoewe," appellant's wife.

{¶ 12} Toledo Police Detective Paul Marchyok, the lead investigator in this case, testified that once BCI "got a hit for Melinda," the police began looking into her "relationships," specifically her male relationships, given that police knew the robber was a male. This led police to appellant and appellant's brother, Keith Schoewe. Police found both men in an apartment in Toledo on December 13, 2019. When Detective Marchyok showed appellant pictures of the Ohio State sweatshirt and black hat, he

6.

denied ever seeing them and claimed that there was "no way" his DNA would be found on either.

{¶ 13} "DNA standards" were obtained from appellant, his brother and, later, from appellant's friend, Arthur Hibbard. Based upon Feldenkris's testing and analysis, she determined that there were two major contributors to the DNA on the collar and hood of the Ohio State sweatshirt. Appellant was "a major contributor," and the "other major contributor," was Melinda Schoewe, although the latter match was "unconfirmed" by Feldenkris, because an actual sample of Melinda's DNA was not gathered in this case (but rather was already in the database). Likewise, there were "two contributors of DNA * * * to the hat. David Schoewe was one of the major contributors. * * * And again, Melinda Schoewe was the unknown, uncompaired [sic] contributor."

{¶ 14} Once appellant was identified as a "good, viable suspect," police asked that he provide a handwriting sample, for purposes of comparing his known handwriting to the bank robbery note. Appellant's letter to his wife, found by his mother-in-law, was also used for comparison purposes. The state's handwriting expert, Amanda White, testified that she found "extremely strong support" for her to conclude that appellant was the source of both writings, i.e. the robbery note and the note to his wife.

{¶ 15} Appellant told police that, based upon the photograph of the robber, it looked to be an acquaintance of his, Arthur Hibbard. To support that theory, the defense gave the police an old Facebook photo of Hibbard and asked the police to investigate.

7.

Police found Hibbard in Monroe, Michigan where he lives and works. Hibbard was ruled out as a suspect, in part, based on the absence of his DNA found in the samples. Also, Detective Marchyok testified that, to him, it did not appear that Hibbard was the person shown in the bank surveillance footage. He explained that, while both men have a beard, Hibbard's beard was fuller than the person depicted in the photo, specifically in the "gap underneath the lips." He added that "Mr. Hibbard doesn't have that gap," whereas the robber—and appellant—do. Marchyok added that, "when I watched the full video [of the robbery] it look[ed] like [appellant] * * * not Arthur Hibbard."

{¶ 16} Following a three-day trial, appellant was found guilty of committing robbery, in violation of R.C. 2911.02(A)(2) and (B), a felony of the second degree (Count 2). He was found not guilty of committing aggravated robbery (Count 1). The trial court sentenced appellant to an indefinite term of a minimum of four years to a maximum of six years in prison. Appellant was also sentenced to a minimum of 18 months to a maximum of 36 months of mandatory postrelease control. The trial court ordered appellant to pay the costs of his confinement and prosecution and to pay restitution to KeyBank in the amount of $2,146.00. Appellant appeals and raises two assignments of error for our review:

ASSIGNMENT OF ERROR I. The trial court erred in denying Appellant's Crim.R. 29 motion.

ASSIGNMENT OF ERROR II. The jury's verdict was against the manifest weight of the evidence presented at trial.

## II. Appellant's robbery conviction is supported by sufficient evidence.

{¶ 17} Appellant was convicted of committing robbery, in violation of R.C. 2911.02(A)(2) which provides, that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another."

{¶ 18} Appellant does not dispute that the state's evidence demonstrates the commission of a robbery, as alleged in the indictment. Instead, he argues that the evidence does not demonstrate that *he* was the perpetrator of the robbery. In his words, "the only issue and question in this case is the identity of the perpetrator."

{¶ 19} "Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. This truism is reflected in the state's constitutional burden to prove the guilt of 'the accused' beyond a reasonable doubt." *State v. Tate*, 140 Ohio St. 3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 15-16, citing *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Like any fact, the state can prove the identity of the accused by "circumstantial or direct" evidence. *State v. Jenks,* 61 Ohio St.3d 259, 272–273, 574 N.E.2d 492 (1991). The relevant question in a sufficiency-of-the-evidence review is whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime proven beyond a reasonable doubt." *Id.* at paragraph two of the syllabus, *following Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 20} Appellant complains that this case is "entirely dependent" on circumstantial evidence. In particular, he cites the absence of anyone from the bank or nearby area who could "direct[ly] identify" him as having robbed the bank. Appellant further complains that, once he was identified as a suspect, the police failed to present any "comparison" photos of himself to the person shown robbing the bank.

{¶ 21} "A witness need not physically point out the defendant in the courtroom as long as there is sufficient direct or circumstantial evidence proving that the defendant was the perpetrator." *Tate* at ¶ 19. Moreover, circumstantial evidence and direct evidence inherently possess the same probative value. *Jenks* at paragraph one of the syllabus. "Circumstantial evidence has been defined as testimony not grounded on actual personal knowledge or observation of the facts in controversy, but of other facts from which inferences are drawn, showing indirectly the facts sought to be established." *State v. Payne*, 11th Dist. Ashtabula No. 2014-A-0001, 2014-Ohio-4304, ¶ 22, citing *State v. Nicely*, 39 Ohio St.3d 147, 150, 529 N.E.2d 1236 (1988).

{¶ 22} The state presented significant circumstantial evidence, from a multitude of sources, tying appellant to the crime. First, the state presented the testimony from the bank teller, H.D., who was the only person to have direct contact with the robber. In the

10.

moments that followed the robbery, H.D. provided a description of the robber that matches appellant's physical characteristics, i.e. a white male with light-colored eyes and short hair, approximately 5'8" or 5'9". Although appellant complains that H.D. was never presented with his picture after he became a suspect, Detective Marchyok explained that it would not have been "prudent" to do so, given how much time had elapsed, especially in relation to their brief interaction, which was "less than 30 seconds." Regardless, this argument challenges the credibility of H.D.'s identification, and "a challenge to credibility sounds in weight, not sufficiency." *State v. McCain*, 9th Dist. Medina No. 18CA0108, 2019-Ohio-4392, ¶ 12.

{¶ 23} The state also presented the testimony of the bank customer, who saw the black baseball hat fall from a person "running" near the bank and who gave a similar physical description—i.e. a "white male about 5'7" and about 170 pounds. And, the apartment owner, who witnessed a person "briskly" wandering (and trespassing) in his yard, described the person as a "younger, white male" with a "slim build." In short, the state presented three eyewitnesses who provided three physical descriptions—all of which fit appellant's general appearance.

{¶ 24} Additionally, Bell testified that she was "hundred percent" [sic] certain that the person depicted in the photograph robbing the bank was "David." Detective Marchyok also testified that appellant and the person in the photograph were one and the same. Likewise, Sergeant Kennedy testified that the recovered sweatshirt and baseball

11.

hat, which bore appellant's DNA, looked to be the same items worn by the robber. Ultimately though, it was a question for the jury to decide whether the appellant and the person depicted in the surveillance video were one and the same. *State v. Gregory*, 6th Dist. Lucas No. L-86-318, 1987 WL 9940, *3 (Apr. 17, 1987) ("Identification is a question of fact for the jury, as is the determination of the reliability of the identifying witnesses.")

{¶ 25} Appellant argues that DNA testing in this case was not "thorough" because the state "only" presented DNA evidence from two items (the Ohio State sweatshirt and baseball hat) and did not present DNA evidence of other items—specifically the gloves, the "other" sweatshirts, the bank robbery note and countertop at the bank. But it is immaterial that there were *additional* items that could have been tested for DNA. "DNA evidence identifying a defendant as a major contributor to the DNA profile found on an object linked to a crime is sufficient evidence to sustain a conviction." *State v. Eckard,* 3d Marion No. 9-15-45, 2016-Ohio-5174, ¶ 33, citing *State v. Brown*, 8th Dist. Cuyahoga No. 98881, 2013-Ohio-2690, ¶ 31, 35 (concluding that Brown's convictions were based on sufficient evidence because his DNA profile was the major contributor to the DNA profile discovered on a shirt connected to the crimes even though the DNA profile on the shirt also revealed the DNA of unidentified minor contributors); *State v. Crabtree,* 9th Dist. Summit No. 24946, 2010–Ohio–2073, ¶ 17, 19 (concluding that a rational trier of fact could have concluded that Crabtree committed the crimes because his DNA was

12.

consistent as the major contributor to the DNA profile discovered on a gun that was connected to the crimes); *State v. Bridgeman,* 2d Dist. Champaign No.2010 CA 16, 2011-Ohio-2680, ¶ 16, 18 (concluding that a reasonable trier of fact could have concluded that Bridgeman committed the bank robbery because DNA testing of a ski mask and glove connected to the robbery revealed Bridgeman as the major contributor to the DNA profile discovered on the glove and the ski mask); *See also State v. Johnson,* 5th Dist. Stark No.2012 CA 00054, 2012-Ohio-5621, ¶ 25 (concluding that "the jury could have concluded that [Johnson] and his cohort invaded the home" because Johnson's DNA was discovered on a hat that the victim identified as the hat "worn by the man who held the gun to his head"). Indeed, appellant expressly concedes that the state's evidence "forensically linked [him]" to the Ohio State sweatshirt and hat, and to the "handwritten robbery note" via handwriting analysis.

{¶ 26} In sum, we find that a rational trier of fact could have found beyond a reasonable doubt that appellant was the person who committed the robbery. Accordingly, we find appellant's first assignment of error not well-taken.

### III. Appellant's conviction is not against the manifest weight of the evidence.

{¶ 27} Having concluded that appellant's conviction is based on sufficient evidence, we next address appellant's argument that his conviction is against the manifest weight of the evidence.

13.

{¶ 28} Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "In other words, a reviewing court asks whose evidence is more persuasive -- the state's or the defendant's?" *Id.* An appellate court considering whether a verdict is against the manifest weight of the evidence must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 29} Appellant argues the state "rushed to judgment" because it failed to consider "other potential suspect[s]," specifically Arthur Hibbard and, therefore, his conviction is against the manifest weight of the evidence. We disagree.

{¶ 30} Police thoroughly investigated Hibbard, whom they located and visited in Monroe, Michigan. Hibbard was cooperative, allowing himself to be interviewed, and provided a DNA sample and testified at trial. Hibbard testified that he lived with appellant for about six months in 2018 and again, for a few days, in 2019. According to Hibbard, appellant was not happy with him when he moved out the second time, and

14.

"from that point on," their relationship was "not good." Hibbard heard, second-hand, that appellant even threatened to "beat [his] ass" after he moved out. Two months before the robbery, in September of 2019, Hibbard relocated to Monroe after securing "a good job" with benefits with an automotive company. Hibbard testified that he was in Monroe on the day of the robbery, and he denied any involvement or knowledge of the crime. Ultimately, Hibbard was ruled out as a suspect, based on the absence of his DNA found in the samples and because the police concluded that Hibbard did not look like the person depicted in the photo. And, given the absence of any evidence that Hibbard robbed the bank, we find no reason that police should have evaluated his handwriting, especially once a handwriting expert determined that it was, in fact, appellant who authored the note.

{¶ 31} Aside from Hibbard, appellant identifies no other suspects that the police failed to investigate. According to the record, though, in the weeks after the robbery, the police distributed still shots of the robber to the Federal Bureau of Investigation and to Crime Stoppers. According to Detective Marchyok, the police received "multiple" tips from the public as to who the robber might be, all of whom Marchyok "was able to rule out." In short, the record does not support appellant's suggestion that the state failed to conduct a full investigation in this case or that it rushed to judgment.

{¶ 32} Strangely, appellant also argues that the state should have examined a handwriting sample from Bell, his mother-in-law, to determine if she authored the

15.

*robbery note*, despite the fact that it was always known that the robber was male. It would be slightly less outlandish to imagine that Bell could—theoretically—have forged the two-page, love letter, ostensibly from appellant to Melinda (i.e. Bell's daughter) in a less-than-obvious attempt to implicate appellant ("Oh yeah, don't tell anybody about anything we did in Toledo that can get us caught up please."). Regardless, the state's handwriting expert testified that there was "extremely strong support" for her to conclude that appellant authored the robbery note *and* the love letter. We find no reason to fault the police for not asking for a handwriting sample from Bell.

{¶ 33} Appellant also argues, more broadly, that Bell was "not [a] credible" witness because she harbors an "intense dislike" for him. We note that Bell was subjected to a thorough cross-examination, and the jury was able to judge for itself what weight, if any, to extend to her testimony. Although we consider the credibility of witnesses under a manifest-weight-of-the-evidence standard, "we extend special deference to the finder of fact's credibility determinations given that it is the finder of fact that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Howard*, 6th Dist. Fulton No. F-17-003, 2017-Ohio-8119, ¶ 29, citing *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 34} Appellant's final manifest-weight argument is the same one he made in support of his sufficiency claim, i.e., that the state's case was entirely circumstantial and without "a direct identification of Appellant" robbing the bank. "Even removing the lens of favorability in favor of the prosecution, through which we examine the sufficiency of the evidence, this is not an exceptional case where the evidence weighs heavily against the convictions." *Eckard* at ¶ 37. The state's case against appellant was overwhelming. In the words of Detective Marchyok, "[a]ll the points of evidence point[ed] to [appellant]."

{¶ 35} In sum, after carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we find that appellant's conviction is not against the manifest weight of the evidence. Therefore, we find that his second assignment of error is not well-taken.

## IV.  Conclusion

{¶ 36} Drawing all inferences in favor of the state, we find that it presented sufficient evidence that appellant committed the offense of robbery. Additionally, the jury did not lose its way when it found the state's case more credible than appellant's. Accordingly, we find appellant's assignments of error not well-taken, and we affirm the April 20, 2022 judgment of the Lucas County Court of Appeals.

{¶ 37} Appellant is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.         _____
                   JUDGE

Christine E. Mayle, J.

Charles E. Sulek, J.          _____
CONCUR.                JUDGE

                  _____
                   JUDGE


This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.